1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11   MICHAEL D. BURCH and THE
     BANKRUPTCY ESTATE OF MICHAEL
12   D. BURCH,[1]
                                    NO. CIV. S-04-0038 WBS GGH
13          Plaintiffs,

14      v.                          MEMORANDUM AND ORDER
                                    RE: DEFENDANTS' MOTIONS FOR
15   REGENTS OF THE UNIVERSITY OF   SUMMARY JUDGMENT
     CALIFORNIA, LARRY VANDERHOEF,
16   GREG WARZECKA, PAM GILL-
     FISHER, ROBERT FRANKS, and
17   FISHER, ROBERT FRANKS, and
     LAWRENCE SWANSON,
18
            Defendants.
19                        ----oo0oo----

20          Plaintiffs have filed claims against defendants for

21   violations of Title IX of the Education Amendments of 1972, 20

22   U.S.C. §§ 1681-1688, and 42 U.S.C. § 1983.  These claims are

23   based on allegations that defendants terminated plaintiff Michael

24

25   _____

26          [1]   The complaint in this case was initially filed by
     plaintiffs as bankruptcy adversary action number 03-2492-B,
27   related to bankruptcy case number 01-31315-b-7, in which the
     debtors are Michael Burch and Sylvia Burch.  The adversary
28   proceeding in the bankruptcy court was withdrawn by court order
     dated January 15, 2004 and renumbered as captioned here.

1

D. Burch[2] from his position as head wrestling coach at the University of California at Davis ("UCD") because he opposed defendants' sex discrimination against female athletes and publicly advocated on the athletes' behalf.  Currently before the court are defendants two (separate) motions for summary judgment under Federal Rule of Civil Procedure 56.  The first seeks summary judgment as to all defendants on both claims due to plaintiff's inability to show that he was retaliated against.  The second seeks summary judgment on plaintiff's § 1983 claim against defendant Larry Vanderhoef.

I. <u>Factual and Procedural Background</u>

        Beginning in 1995, UCD employed plaintiff as its head men's wresting coach through a series of one-year contracts.  (Compl. ¶ 5.)  Plaintiff was classified as a part-time employee with the Athletic Department, but he also served as a lecturer in the Religious Studies Department starting in 1997.  (<u>Id.</u> ¶ 6; Defs.' Statement of Undisputed Facts ("SUF") Ex. A (Warzecka Decl. ¶ 4).)  At the time of plaintiff's termination on June 30, 2001, he was employed pursuant to a contract with the Athletic Department that started on July 1, 2000 and, by its terms, ended on June 30 of the following year.  (Defs.' SUF Ex. M (contract).)

        In addition to the Board of Regents of the University of California, which governs the University of California campuses including UCD, plaintiff is suing several UCD

---

[2]    The bankruptcy estate of Michael D. Burch is also a plaintiff in this action because Burch's claims became assets of that estate when he filed bankruptcy on September 27, 2001.  (<u>See</u> Mar. 16, 2004 Order 2 n.2.)  However, the court will refer to "plaintiff", meaning Michael Burch the individual, throughout this order.

administrators for damages and his reinstatement.  Defendant
Larry Vandehoef is the Chancellor of UCD.  (Compl. ¶ 12.)
Defendant Greg Warzecka is the Athletic Director at UCD and
defendants Pam Gill-Fisher and Lawrence Swanson are Associate
Athletic Directors.  (Id. ¶¶ 13-14, 16.)  Defendant Robert Franks
is the Assistant Chancellor for the Student Affairs Department,
which oversees the Athletic Department at UCD.  (Id. ¶ 15; Defs.'
SUF Ex. N (Franks Decl. ¶ 2).)  In 2001, Franks supervised
Warzecka, who in turn supervised Swanson (plaintiff's direct
supervisor).  (See Pl.'s SUF Ex. 15 (Franks Dep. 119:2-11);
Defs.' SUF Ex. M (contract).)

        The UCD men's wrestling team ("the team") competes at
the Division I level of the National Collegiate Athletic
Association ("NCAA").  (Compl. ¶ 29.)  Prior to plaintiff's
appointment as head coach, the team suffered six straight losing
seasons.  (Id. ¶ 32.)  However, during the 1995-96 season,
plaintiff's first year, the team won five dual meets.  (Id. ¶
33.)  During his final year, the team won ten dual meets and,
according to plaintiff, enjoyed its first winning season in
twenty years.  (Id. ¶ 37.)  Additionally, the student newspaper,
The California Aggie, named plaintiff "Coach of the Year" for the
1996-97 and 2000-01 seasons.  (Id. ¶¶ 34, 37; Answer ¶¶ 34, 37.)
In general, defendants do not dispute that the team's win-loss
record, and the wrestling program overall, improved significantly
during plaintiff's tenure.  (Defs.' Mem. of P. & A. in Supp. of
Mot. for Summ. J. 36.)

///
///

A. <u>The Relationship Between Plaintiff and His Supervisors</u>

However, despite plaintiff and the team's success on the mat, defendants' documents submitted in support of the present motions indicate that a number of conflicts between plaintiff and his supervisors occurred over the years. The first conflict that plaintiff can recall occurred during his first year of coaching, when he approached Warzecka and expressed interest in teaching Physical Education classes. (Pl.'s SUF Ex. 13 (Burch Dep. 175:3-176:3).) Warzecka told plaintiff in a "condescending" tone that this opportunity was not available to him. (<u>Id.</u> at 175:20-25.) Another conflict occurred during plaintiff's second year, when he expressed his concern about his pay to Warzecka during contract discussions. (<u>Id.</u> at 176:4-11.) Warzecka allegedly told him that, in the future, he would put plaintiff's contract in plaintiff's box and he could either sign it or UCD would look for another coach. (<u>Id.</u> at 176:14-24.) Throughout plaintiff's tenure, he believed that he should have been paid more for his coaching activities. (<u>Id.</u> at 625:24-626:2.)

The next dispute concerned athletic scholarships.[3] When plaintiff began coaching, UCD did not offer athletic scholarships because of restrictions imposed by the Northern California Athletic Conference (of which UCD was a member). (Defs.' SUF Ex. A (Warzecka Decl. ¶ 5).) Shortly thereafter, the Athletic Department circulated proposals indicating that, pursuant to UCD's change in athletic conferences, athletic scholarships might be available in 1997-98 for the sports in

---

[3]   Athletic scholarships are alternatively called "grants-in-aid" by the parties.

4

which UCD participated at the Division I level (wrestling and women's gymnastics).  (Id.)  According to defendants, however, the finalized plan, approved in late 1996 by Chancellor Vanderhoef, authorized athletic scholarships to be issued starting the 1998-99 season.  (Id.; Pl.'s SUF Ex. 16 (Warzecka Dep. 212:21-24).)

Nevertheless, while recruiting students to join the team for the 1996-97 school year, plaintiff represented to prospective students that scholarship money would be available to them beginning in 1997-98.  (Pl.'s SUF Ex. 13 (Burch Dep. 158-59).)  Plaintiff believes that Warzecka authorized him to make that promise.  (Id. at 160:9-161:13.)  Predictably, the athletes recruited by plaintiff and their parents complained in person to both Warzecka and plaintiff after learning that athletic scholarships would not be awarded in 1997-98.  (Id. at 168-69.)  This situation created tension between plaintiff and Warzecka that led to their participation in a university facilitated mediation.[4]  (Id. at 172; Defs.' SUF Ex. AA (Mediation Settlement Agreement).)

_____

[4]    Plaintiff "denies", without support, this "characterization of the mediation."  (Pl.'s SUF No. 25.) However, the non-movant in a motion for summary judgment cannot simply deny the moving party's stated material fact.  "[T]he nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." Weaver v. Ohio State Univ., 71 F. Supp. 2d 789, 792 (S.D. Ohio 1998); see also Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (requiring "the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment"). Moreover, in this instance, plaintiff's research into this fact is obviously incomplete, as the response submitted to the court still includes the assumed internal comment "WAS THIS THE REASON FOR THE MEDIATION?"

1    Defendants also point the court to the failure of two

2  female wrestlers[5] to complete documentation required by UCD to

3  support their argument that plaintiff was lax in performing his

4  oversight duties.  (See Defs.' SUF Ex. II (Gill-Fisher Decl. ¶ 4

5  (wrestlers completed required paperwork and were allowed to

6  return to practice)).)  Plaintiff contends that he was not

7  required to ensure that the documentation was complete because it

8  was not required of the female wrestlers by NCAA rules.  (Pl.'s

9  SUF Ex. 13 (Burch Dep. 435:21-437:6).)

10    The next dispute defendants cite involved documentation

11 for $420 in recruiting costs advanced to plaintiff.  On May 25,

12 2000, UCD recruiting coordinator Mitch Campbell wrote a

13 memorandum to defendant complaining that defendant had not

14 submitted an accounting of how the money was spent.  (Id. Ex. PP

15 (Campbell Mem.).)  On June 13, 2000, plaintiff, Campbell, Gill-

16 Fisher, and Jennifer Cardone, the Assistant Athletic Director for

17 Compliance, met concerning defendant's continuing failure to

18 submit his expense documents and resolved that plaintiff would

19 submit the required documentation by June 16, 2000.  (Id. Ex. RR

20 (Minutes of June 13, 2000 Meeting).)  "It was also established

21 [at the meeting] that workload issues or employee status . . .

22 [would] not excuse [plaintiff] from turning in the required

23 paperwork."  (Id.)

24    Also in the spring of 2000, Warzecka conducted a

25 meeting regarding UCD's plans for moving various coaching

26

27      [5]   Although wrestling is a men's sport, women wrestlers
   were permitted to practice with the team, as discussed in more
28 detail below.

1  positions to full-time status.  (Id. Ex. A (Warzecka Decl. ¶

2  21).)  The plan did not include the head coach of the wrestling

3  team in the first round of changes.  (Id. Ex. II (Gill-Fisher

4  Decl. ¶ 5).)  According to Gill-Fisher, at some point after the

5  meeting, Burch asked her to amend the plan to make the wrestling

6  coach a full-time position.  (Id.)  Gill-Fisher declined to offer

7  her support for this change, stating that UCD needed to extend

8  more full-time positions to female coaches to comply with Title

9  IX.  (Id.)  Gill-Fisher alleges that, in response, plaintiff

10 "blurted out '[f]uck Title IX,' and stormed out of [her] office."

11 (Id.; Pl.'s SUF Ex. 17 (Gill-Fisher Dep. 564:3-565:23).)

12        The next dispute involved an open tournament on

13 November 17, 2000 at Southern Oregon University.  Plaintiff

14 contends that the team was scheduled to participate in the

15 tournament, and defendants contend that the team was not

16 scheduled to do so: both have submitted schedules supporting

17 these positions.  (See Defs.' SUF Ex. AAA (defendants' version of

18 2000-01 wrestling schedule); id. Ex. BBB (plaintiff's version of

19 2000-01 wrestling schedule).)  Compliance Director Cardone,

20 concerned by plaintiff's alleged failure to schedule the

21 tournament, conducted an investigation into the Oregon trip,

22 looking for potential violations of intercollegiate athletics

23 rules.  (Id. Ex. JJ (Cardone Decl. ¶ 5).)  The issue was

24 apparently still unresolved several months later.  Although

25 plaintiff sent Associate Athletic Director Swanson an e-mail on

26 March 26, 2001 claiming that all paperwork for that trip had been

27 completed and submitted to Gill-Fisher, (id. Ex. DDD (Mar. 26,

28 2001 Burch e-mail)), Cardone declared that the required expense

1  reports were not submitted until April, 2001.  (Id. Ex. JJ
2  (Cardone Decl. ¶ 5).)   The investigation itself consequently
3  continued until August, 2001--well after plaintiff's termination.
4  (Id.)

5        In March, 2001, there was another dispute, again
6  potentially involving NCAA violations, regarding a recruiting
7  trip that plaintiff took to Stockton to watch the California
8  State High School Wrestling Championships.   Two of plaintiff's
9  assistant coaches, Mike Collier and Beau Weiner, also attended
10 the event.  (Pl.'s SUF Ex. 13 (Burch Dep. 579).)   Although
11 plaintiff stated in his deposition that he met his assistant
12 coaches there by chance and not by plan, (id. at 579:7-8), he
13 claimed a hotel room for three people and meals for three people
14 in his reimbursement form submitted to the university.  (Pl.'s
15 SUF No. 103 (admitted); Defs.' SUF Ex. JJJ (Stockton trip
16 documentation).)   Under NCAA rules, only two coaches are
17 permitted to recruit off-campus, and thus, according to
18 defendants, attendance by the three coaches violated that rule.
19 (Id. Ex. X (Cardone Dep. 132:1-25).)   Furthermore, defendants
20 also argue that because a volunteer coach like Weiner is not
21 permitted to recruit off-campus, another NCAA rule was
22 potentially violated by that same trip.   (Id.)

23       After Cardone investigated the Southern Oregon
24 University scheduling incident, the Stockton recruiting trip
25 violations, and other potential NCAA rule violations, UCD self-
26 reported plaintiff's perceived infractions.  (Pl.'s SUF Ex. 125
27 (Nov. 7, 2001 Letter from Melvin Ramey to Christopher Strobel).)
28 Although Cardone appears to have concluded that the scheduling

discrepancies did not violate NCAA rules, (id. Ex. 126 (Cardone Dep. 129:10-13)), she did find that the Stockton recruiting trip, the use of a second volunteer coach, excessive time spent in Las Vegas following an authorized competition, excessive allowances for athletes' meal expenses, and plaintiff's failure to ensure that female wrestlers completed required paperwork all violated NCAA policies. (Id. Ex. 125 (Sept. 12, 2001 Letter from Cardone to Gill-Fisher).) This investigation was not complete when defendants made the decision not to renew plaintiff's coaching contract; however, it was certainly well underway in the spring of 2001.

In addition to pointing the court to these specific disputes, defendants allege that plaintiff was generally an unpleasant person to work with. "Throughout his employment with UCD, [plaintiff] had always complained about his pay." (Defs.' SUF Ex. A (Warzecka Decl. ¶ 20).) Additionally, "[plaintiff] often complained of being overworked." (Id. ¶ 22.) Gill-Fisher further described plaintiff as "confrontational." (Id. Ex. II (Gill-Fisher Decl. ¶ 16).) Associate Athletic Director Robert Bullis described plaintiff as "bullying" and unable to "understand the word no" when it came to budget discussions. (Id. Ex. R (Bullis Dep. 116-17).) Mary Schenk, the Management Services Officer for the Exercise Biology and Athletic Department at UCD from 1998 to 2002, stated that, during disputes about his pay, plaintiff would raise his voice at her and use profanity. (Id. Ex. CCCC (Schenk Decl. ¶ 2).) "Overall, [Schenk] found [plaintiff] to be rude and a difficult person to work with." (Id. ¶ 4.) Schenk complained about plaintiff to Bullis, among

9

others.  (Id.)

Finally, defendants also generally argue that plaintiff was unorganized.  (See id. Ex. FFFF (Boyle Dep. at 126 (travel coordinator noting that plaintiff's submission of travel documents was late)); id. Ex. II (Gill-Fisher Decl. ¶ 17 (declaring that plaintiff violated policy concerning submission of receipts more often than other coaches)).)  In three of plaintiff's six years with UCD, he ran budget deficits between $1,000 and $4,000.[6]  (Defs.' SUF Ex. R. (Bullis Dep. 53:4-54:21); id. Ex. LLL (Bullis Decl. ¶ 5).)

In light of these disputes, defendants testified that Warzecka decided not to renew plaintiff's contract in a meeting with Gill-Fisher and Swanson on April 24, 2001.  (Defs.' SUF No. 124.)  Specifically, defendants provide the following reasons for the decision not to renew:

> (1) his inability to work effectively with senior administrators and Athletic Department staff members;
> (2) his long history exhibiting an unwillingness to abide by Athletic Department rules;
> (3) his continual and unreasonable demands for more pay, better facilities, and exceptions to Athletic Department policies;
> (4) his multiple years of carrying an unapproved deficit in his budget; and
> (5) his failure to cooperate during a pending investigation regarding possible NCAA violations.

---

[6]    Plaintiff argues that because the books did not close until June, 2001, defendants cannot claim to have legitimately fired him for running over budget during the 2000-01 season. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. 40; see also (Defs.' SUF Ex. LLL (Bullis Decl. ¶ 5 (stating that plaintiff went over budget in the 1998-99, 1999-2000, and 2000-01 seasons)).) However, the team's season ended in March and defendant does not point to any sources of income that could have made up for any existing deficits.  Moreover, plaintiff fails to cite to any support for his naked denial of defendants' facts regarding budget overruns and further admits to exceeding his budget in some years.  (Pl.'s SUF Nos. 169, 170.)

(<u>Id.</u> No. 132.)  Plaintiff, citing discrepancies in defendants' testimony that will be addressed in further detail below, argues in response that these were not the real reasons for his termination and further that the decision was not actually made on April 24, 2001.  It is sufficient for now to note that plaintiff was not informed of the decision until May 29, 2001 and, according to his deposition testimony, defendants did not cite any of the reasons above in defense of their decision at that meeting.  (Pl.'s SUF No. 206; <u>id.</u> Ex. 13 (Burch Dep. 714:1-715:14).)  Additionally, defendants appear to have continued to actively negotiate the terms of plaintiff's contract for the 2001-02 season throughout the month of May, despite allegedly having already decided not to renew his employment.  (Defs.' SUF Nos. 180-182; <u>id.</u> Ex. A (Warzecka Decl. ¶¶ 26, 28-29).)

  B.  <u>Plaintiff's Advocacy on Behalf of Female Wrestlers</u>

    Plaintiff submits that the real reason for the decision not to renew his contract was his self-styled "positive advocacy" on behalf of female wrestlers who practiced with his team.[7] (Defs.' SUF Ex. HH (Pl.'s Resps. to Interrogs. of UCD-2d Set, No. 39.)  Although women had "unofficially" participated in the wrestling program before and during plaintiff's tenure, in the year leading up to plaintiff's dismissal, the opportunities for women wrestlers declined as a result of roster caps that were

---

   [7] Women's wrestling was not a varsity sport at UCD between 1995 and 2001.  (Defs.' SUF Ex. II (Gill-Fisher Decl. ¶ 3).)  Instead, women were permitted to practice with the men's team if they filled out the same paperwork as the male wrestlers. (<u>Id.</u>; <u>see also</u> Pl.'s SUF Exs. 20, 24 (UCD Wrestling Media Guides).)

implemented to reduce costs and to balance the number of male and female varsity athletes at UCD.  (Id. Ex. A (Warzecka Decl. ¶ 7); Pl.'s SUF Exs. 20, 24 (UCD Wrestling Media Guides).)  The wrestling team was officially capped at 30 and, either because the women could not beat any of the men for a spot or because defendants instructed plaintiff to remove women from the men's team,[8] the female wrestlers were not included on the 2000-01 roster.

Plaintiff asserts that he found this situation distressing and that he repeatedly challenged UCD's efforts to phase out women's wrestling.  Specifically, plaintiff "tried to argue the point" when Warzecka "ordered the removal of the women from the wrestling program in October 2000."  (Defs.' SUF Ex. HH (Pl.'s Resps. to Interrogs. of UCD-2d Set, No. 39).)  When Warzecka threatened to terminate plaintiff in response, plaintiff "complied with the order under protest and wrote a memo to Defendants indicating that the women were removed from the program at [defendants'] request."  (Id.)  Plaintiff also insists that he participated in the female wrestlers' efforts to be

---

[8]    The parties vigorously dispute who is responsible for the removal of the women from the roster.  (Pl.'s SUF No. 66.)  As suggested above, plaintiff stated that he was explicitly told to remove the female wrestlers from the roster while defendants declared that the 30, and later 34, available slots were given to plaintiff to fill as he saw fit, regardless of an athlete's gender.  (Id. Ex. 13 (Burch Dep. 320:12-321:4); id. Ex. 17 (Gill-Fisher Dep. 407:14-411:9).)  Defendants add that decisions regarding who to put on a roster are entirely within the discretion of the coach, not the Athletic Department supervisors.  (Defs.' SUF Ex. II (Gill-Fisher Decl. ¶ 7).)  Moreover, plaintiff testified that only one of the women wrestlers, Lauren Mancuso, had even a chance of beating one of the men on the team for a spot on the roster.  (Pl.'s SUF Ex. 13 (Burch Dep. 218:16-220:16).)

reinstated.  In January 2001, he "reminded . . . Warzecka that the women wanted to be varsity" and further communicated that they wanted access to varsity benefits, including medical care. (Id. No. 40.)  Plaintiff also states that he told Warzecka at this time that the women were "offended by Mr. Warzecka's treatment of them . . . ."  (Id. (Pl.'s Resps. to Interrogs. of UCD-2d Set, No. 40).)  Finally, plaintiff also spoke to Swanson "about these problems" around the same time.  (Id.)

On April 24, 2001, three female wrestlers filed a complaint with the Office for Civil Rights of the United States Department of Education ("OCR") in which they alleged gender-based discrimination in violation of Title IX.  (Pl.'s SUF No. 175, 175.)  They also sent letters to Warzecka, Gill-Fisher, and Swanson on April 30, 2001 to inform them of the complaint.  (Id. No. 175.)  Within the first week of May, these defendants and Franks had all received notice of the OCR complaint in some form. (Id. Nos. 177-179.)

In their complaint, the women credited plaintiff with having made them aware that the "athletic administration's orders" to remove them from the wrestling team might constitute illegal sex discrimination.  (Defs.' SUF Ex. QQQQ (Apr. 24, 2001 OCR Compl. ¶¶ 7-8).)  Additionally, in the weeks that followed, plaintiff played an active part in the women's efforts to draw attention to their plight and their complaint.  Through protests, newspaper articles, television broadcasts, and even a meeting with State Assembly Member Helen Thomson, plaintiff visibly supported the female wrestler's allegations of sex discrimination throughout the month of May.  (Defs.' SUF Ex. HH (Pl.'s Resps. to

13

1  Interrogs. of UCD–2d Set, No. 40).)  He also started bringing up

2  the reinstatement of women's wrestling as part of his ongoing

3  contract negotiations, also in May.  (Pl.'s SUF Nos. 183, 186-

4  188, 222 (noting that the women's wrestling team issue was not a

5  part of plaintiff's contract negotiations until May 14, 2001).)[9]

6      C.   The Claims at Issue

7          At an oral hearing on March 8, 2004, addressing

8  defendants' motion to dismiss, the parties clarified the scope of

9  this litigation and the defendants targeted by each claim.

10  Plaintiff's first claim, for retaliation in violation of Title

11  IX, is asserted only against defendant UCD.  Meanwhile, claim two

12  is asserted against all defendants except UCD and alleges that

13  these actors violated § 1983 by firing plaintiff for exercising

14  his First Amendment right to speak freely on a matter of public

15  concern.  Defendants in claim two are sued in both their official

16  and individual capacities, thus making it possible for plaintiff

17  to seek both prospective injunctive relief (his reinstatement as

18  head coach of the wrestling team) and money damages from these

19  individuals.  (See Mar. 16, 2004 Order 4 n.4.)

20  ///

21  ///

22  ///

23

24      [9]   Rather than responding with affidavits or pointing to
existing evidence in this case, as required by Federal Rules of

25  Civil Procedure 56(c) & (e), plaintiff merely provides the
unsworn arguments of his lawyers to refute the logical conclusion

26  to be drawn from defendants' presentation of the evidence: that
"the women's issue" was not initially part of plaintiff's

27  contract discussions and did not come up in these negotiations
until after the women filed their OCR complaint.  (Pl.'s SUF No.

28  188.)

II.  <u>Discussion</u>

        In this motion for summary judgment, defendants do not contend that they were unaware of plaintiff's activities in support of the women's complaint as of May, 2001. (<u>See</u> Defs.' SUF Ex. A (Warzecka Decl. ¶ 23); Answer ¶ 77 (admitting that plaintiff cooperated with the OCR investigation into the women's complaint).)  They do, however, argue that prior to May 2001, plaintiff had never complained of discrimination per se.  (<u>Id.</u>) Accordingly, because the decision not to renew plaintiff's contract was made in late April, defendants postulate that summary judgment is appropriate, given that they could not possibly have retaliated against plaintiff in April for his conduct in May.  In the event that the court denies the requested relief, Chancellor Vanderhoef moves for dismissal of plaintiff's § 1983 claim as to him, arguing that as a remote supervisor, he did not have any direct involvement in any deprivation of plaintiff's constitutional rights, which is required for supervisory liability.  The court will address these separate motions for summary judgment in turn.

        However, the court must first address nearly 250 evidentiary objections raised by defendants on April 24, 2006. Defendants specifically target statements in the declarations of Michael Burch, Richard Seyman, Michael Maben, Charlie Hong, David Amato, and Earl Walker, Jr. (submitted in opposition to defendants' motions) and move to strike portions of these declarations.  They also object to a substantial number of plaintiff's 176 exhibits submitted in opposition to their motions, arguing generally that because these items were not

introduced via a valid affidavit, "all of Plaintiffs' Exhibits
that are not self authenticating" should be stricken.  (Defs.'
Evid. Objs. to Pl.'s Evid. 2.)

    A.   Evidentiary Objections

         In recent months, <u>every</u> motion for summary judgment on
this court's calendar has been held up by "evidentiary
objections" that have required the court to conduct hearings on
the admissibility of evidence prior to addressing the merits of
the motion.  It appears to have become the "standard of practice"
on summary judgment motions for attorneys to comb through the
materials submitted by their opponents in search of any
statement, phrase, or document which might in any way run afoul
of the Federal Rules of Evidence, and to file objections on all
conceivable grounds.  In some of the larger law firms, newer
attorneys are assigned to the case simply for that purpose.  Only
the attorneys and their clients know how many billable hours are
spent on such endeavors.

         Through these proceedings, the court has learned that
the fount of this practice may be language contained in William
W. Schwarzer et al., <u>California Practice Guide: Federal Civil</u>
<u>Procedure Before Trial</u> § 14:107-111 (2005) (Rutter Group Practice
Guide), wherein the authors counsel litigators to object to
inadmissible evidence, "either orally or in writing, at or before
the hearing," to preserve the objection for appeal, <u>id.</u> § 14:111.
This advice seems to ignore the practice under the Local Rules of
this court, similar to most others, which require the non-moving
party to file its opposition to the motion fourteen days before,
and the moving party's reply seven days before, the date of the

1  hearing on the motion.  <u>See</u> Local Rules 78-230 and 56-260.

2  Inundating the court with detailed evidentiary objections by the

3  moving party less than two weeks before the hearing, and by the

4  non-moving party less than one week before the hearing, can

5  hardly lead to a meaningful hearing on the merits of the motion.

6        The court is mindful of the language in Ninth Circuit

7  cases that "[d]efects in evidence submitted in opposition to a

8  motion for a summary judgment are waived 'absent a motion to

9  strike or other objection.'"  <u>FDIC v. N.H. Ins. Co.</u>, 953 F.2d

10 478, 484 (9th Cir. 1991) (quoting <u>Scharf v. U.S. Att'y Gen.</u>, 597

11 F.2d 1240, 1243 (9th Cir. 1979)).  However, the court cannot

12 believe that the Court of Appeals would allow a summary judgment

13 to stand which was based on evidence completely lacking indicia

14 of admissibility simply because the opposing party failed to make

15 an evidentiary objection.  Regardless of whether a party objects,

16 the Court of Appeals will always recognize plain error.  Fed. R.

17 Evid. 103(d); <u>McClaran v. Plastic Indus., Inc.</u>, 97 F.3d 347, 357

18 (9th Cir. 1996).  If consideration of the evidence would be so

19 obviously improper and substantial, such that "failure to notice

20 and correct it would affect the fairness, integrity, or public

21 reputation of judicial proceedings[,]" a party could still

22 challenge its consideration on appeal even if it initially failed

23 to object to its admission.  <u>Permian Petroleum Co. v. Petroleos</u>

24 <u>Mexicanos</u>, 934 F.2d 635, 647-48 (5th Cir. 1991); <u>see also</u> <u>United</u>

25 <u>States v. Sua</u>, 307 F.3d 1150, 1154 (9th Cir. 2002).

26       Nevertheless, attorneys routinely raise every objection

27 imaginable without regard to whether the objections are

28 necessary, or even useful, given the nature of summary judgment

17

1   motions in general, and the facts of their cases in particular.
2   For example, objections to evidence on the ground that it is
3   irrelevant, speculative, and/or argumentative, or that it
4   constitutes an improper legal conclusion are all duplicative of
5   the summary judgment standard itself; yet attorneys insist on
6   using evidentiary objections as a vehicle for raising this point.
7   A court can award summary judgment only when there is no genuine
8   dispute of <u>material</u> fact.  It cannot rely on irrelevant facts,
9   and thus relevance objections are redundant.

10          Instead of <u>objecting</u>, parties should simply <u>argue</u> that
11   the facts are not material.  Similarly, statements in
12   declarations based on speculation or improper legal conclusions,
13   or argumentative statements, are not <u>facts</u> and likewise will not
14   be considered on a motion for summary judgment.  Objections on
15   any of these grounds are simply superfluous in this context.
16   <u>See, e.g.</u>, <u>Smith v. County of Humboldt</u>, 240 F. Supp. 2d 1109
17   (2003), 1115-16 (N.D. Cal. 2003) (refusing to rule on the
18   evidentiary objections in defendant's reply because "even if the
19   evidence submitted by plaintiff is considered by this Court,
20   plaintiff fails to state a colorable claim").  Again, instead of
21   challenging the admissibility of the evidence, lawyers should
22   challenge its sufficiency.

23          Additionally, objections to the <u>form</u> in which the
24   evidence is presented are particularly misguided where, as here,
25   they target the non-moving party's evidence.  <u>See</u> <u>Celotex Corp.</u>
26   <u>v. Catrett</u>, 477 U.S. 317, 324 (1986) ("We do not mean that the
27   <u>nonmoving</u> party must produce evidence in a form that would be
28   admissible at trial in order to avoid summary judgment. . . .

Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) . . . ."); <u>Cox v. Amerigas Propane, Inc.</u>, No. CV-04-101, 2005 WL 2886022, at *2 (D. Ariz. Oct. 28, 2005) ("At the summary judgment stage, the court focuses on the admissibility of the evidence's contents, not the admissibility of its form.").  Federal Rule of Civil Procedure 56(e), not the Federal Rules of Evidence, specifies the required format and significantly demands only that "[s]upporting and opposing affidavits . . . set forth such facts as <u>would be admissible</u> in evidence . . . ."  Fed. R. Civ. P. 56(e) (emphasis added).

As the Ninth Circuit has held, "to survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing <u>Block v. City of L.A.</u>, 253 F.3d 410, 418-19 (9th Cir. 2001)).  In other words, when evidence is not presented in an admissible form in the context of a motion for summary judgment, <u>but it may be presented in an admissible form at trial</u>, a court may still consider that evidence.  <u>Id.</u> at 1037 (considering evidence from a diary, notwithstanding the defendant's hearsay objections, in the context of a motion for summary judgment because the contents of the diary were "mere recitations of events within the [plaintiff/appellant's] personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways").  Summary judgment is not a game of "Gotcha!" in which missteps by the non-movant's counsel,

1  rather the merits of the case, can dictate the outcome.

2          Notwithstanding the foregoing, the court cannot

3  overlook binding precedent where the Ninth Circuit has declared

4  that at least some forms of evidentiary objections are

5  appropriate in the context of summary judgment.  Specifically,

6  the Court of Appeals has "repeatedly held that 'documents which

7  have not had a proper foundation laid to authenticate them cannot

8  support [or defend against] a motion for summary judgment.'"

9  Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1182 (9th

10 Cir. 1988) (quoting Canada v. Blain's Helicopters, Inc., 831 F.2d

11 920, 925 (9th Cir. 1987)).  Consequently, objections predicated

12 upon Federal Rule of Evidence 901 are appropriate in the context

13 of a motion for summary judgment.  This rule is consistent with

14 the text of Rule 56, which indirectly allows courts to consider

15 evidence other than pleadings, depositions, answers to

16 interrogatories, admissions on file, and affidavits by permitting

17 affiants to attach or serve "therewith" "sworn or certified

18 copies of all papers or parts thereof referred to in [the]

19 affidavit."  Fed. R. Civ. P. 56(e).

20         Whether the authentication requirement should be

21 applied to bar evidence when its authenticity is not actually

22 disputed, is, however, questionable.  Significantly, and as a

23 matter of common sense, the Ninth Circuit has held that a

24 district court's consideration of unauthenticated evidence in

25 conjunction with a motion for summary judgment is harmless error

26 when a competent witness with personal knowledge could have

27 authenticated the document.  Hal Roach Studios, Inc. v. Feiner &

28 Co., 896 F.2d 1542, 1552 (9th Cir. 1990).  Again, Rule 56(e)

20

1  requires only that evidence "would be admissible", not that it

2  presently be admissible.  Such an exception to the authentication

3  requirement is particularly warranted in cases such as this where

4  the objecting party does not contest the authenticity of the

5  evidence submitted but nevertheless makes an evidentiary

6  objection based on purely procedural grounds.[10]  See Fenje v.

7  Feld, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003) ("Even if a party

8  fails to authenticate a document properly or to lay a proper

9  foundation, the opposing party is not acting in good faith in

10 raising such an objection if the party nevertheless knows that

11 the document is authentic.").

12      Similarly uncertain is how the court should approach

13 hearsay objections to evidence submitted in opposition to a

14 motion for summary judgment.  Because "[v]erdicts cannot rest on

15 inadmissible evidence" and a grant of summary judgment is a

16 determination on the merits of the case, it follows that the

17 moving party's affidavits must be free of hearsay.  Gleklen v.

18 Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C.

19 Cir. 2000); City of Tenakee Springs v. Clough, 750 F. Supp. 1406,

20 1416 (D. Alaska), rev'd on other grounds, 915 F.2d 1308 (9th Cir.

21 1990) ("Since summary judgment is a substitute for a trial on the

22 merits, it is vital that the party opposing the motion be

23 accorded the same evidentiary safeguards that would be applicable

24 at trial . . . .").  Moreover, to some extent, the same rule

25 would seem to apply to affidavits submitted by the non-movant,

26

27      [10]    The court cannot stress enough that it does not behoove

28 anyone to make objections simply for the sake of making
   objections.

21

1  because if the non-movant is unable to cure the hearsay prior to

2  trial, "the objective of summary judgment--to prevent unnecessary

3  trials--would be undermined." <u>Gleklen</u>, 199 F.3d at 1369.

4        Yet the court cannot ignore the fact that a non-movant

5  in a summary judgment setting is not attempting to prove its

6  case, but instead seeks only to demonstrate that a question of

7  fact remains for trial.  Recognizing the significance of this

8  difference, the Ninth Circuit long ago adopted "a general

9  principle" whereby it "treat[s] the opposing party's papers more

10  indulgently than the moving party's papers."[11]  <u>Lew v. Kona</u>

11  <u>Hosp.</u>, 754 F.2d 1420, 1423 (9th Cir. 1985); <u>Scharf</u>, 597 F.2d at

12  1243 ("[C]ourts generally are much more lenient with the

13  affidavits of a party opposing a summary judgment motion."); <u>see</u>

14  <u>also</u> <u>Tetra Techs. Inc. v. Harter</u>, 823 F. Supp. 1116, 1120

15  (S.D.N.Y. 1993) ("Material in a form not admissible in evidence

16  may be used to avoid, but not to obtain summary judgment . . .

17  ."); 10B Charles Alan Wright et al., <u>Federal Practice and</u>

18  <u>Procedure</u> § 2738 (3d ed. 1998 & Supp. 2005) (noting that some

19  courts, including the Ninth Circuit, have applied a "double

20  standard" to the admissibility of affidavits on summary

21  judgment)).

22        In practice, however, the Ninth Circuit has not

23  consistently applied this principle.  For example, in <u>Carmen v.</u>

24  <u>San Francisco Unified School District</u>, the court noted that "on

25  ────────────────

26      [11]    Significantly, the practice guide that has apparently
    spawned the flurry of evidentiary objections that have besieged
27  the court's law and motion calendar speaks only of "Objections to
    <u>Moving</u> Party's Evidence".  Schwarzer et al., <u>California Practice</u>
28  <u>Guide: Federal Civil Procedure Before Trial</u> § 14:107 (emphasis
    added).

summary judgment, the non-movant's hearsay-laden declaration "would be enough to establish a genuine issue of fact."  237 F.3d 1026, 1028-29 (9th Cir. 2001).  But a year later, in <u>Orr v. Bank of America, NT & SA</u>, the court upheld the exclusion of depositions submitted <u>in opposition</u> to a motion for summary judgment because these exhibits contained inadmissible hearsay.  285 F.3d 764, 778-80 (9th Cir. 2002); <u>see also</u> <u>Beyene</u>, 854 F.2d at 1182-83 (same).

        In this court's opinion, the approach taken in <u>Carmen</u> was more sound, given that "[a]dmissibility of testimony sometimes depends upon the form in which it is offered, the background which is laid for it, and perhaps on other factors as well.  It is therefore possible, and perhaps probable, that . . . out of court [statements from an affidavit or deposition] will be admissible [through testimony at trial]."  <u>Corley v. Life & Cas. Ins. Co. of Tenn.</u>, 296 F.2d 449, 450 (D.C. Cir. 1961).  Nevertheless, because <u>Beyene</u> predates <u>Carmen</u>, the current law in the Ninth Circuit is arguably that the rule against hearsay, Fed. R. Evid. 802, applies to evidence submitted in support of <u>and</u> in opposition to a motion for summary judgment.  <u>See</u> <u>In re Watts</u>, 298 F.3d 1077, 1083-84 (9th Cir. 2002) ("It is a bedrock principle of our court that the published decision of one three-judge panel binds every other panel from that day forward.").

        As a practical matter, the court finds this entire exercise of considering evidentiary objections on a motion for summary judgment to be futile and counter-productive.  If a court must hear up to hundreds of objections during one civil calendar

1  in addition to the motion itself, then this procedure begins to
2  defeat the objectives of modern summary judgment
3  practice--namely, promoting judicial efficiency and avoiding
4  costly litigation.  See Roberts v. Browning, 610 F.2d 528, 531
5  (8th Cir. 1979).  More importantly, even seemingly appropriate
6  objections based on hearsay and failures to authenticate/lay a
7  foundation are difficult to address away from the dynamics of a
8  trial.  During trial, when a party raises valid evidentiary
9  objections, the opposing party will have an opportunity to
10  present the evidence in an alternative and admissible form.  At
11  trial, a question can always be rephrased if an objection to it
12  is sustained.  Not so in the context of summary judgment
13  practice.

14      As a further example, if one witness attempts
15  unsuccessfully to testify about matters regarding which that
16  witness lacks personal knowledge, another witness may later be
17  able to testify to the same evidence based upon her firsthand
18  knowledge.  In the context of a motion for summary judgment,
19  however, the court must often delay a hearing on the merits for
20  several weeks to offer parties a chance to cure the defects
21  raised by the objections.  The alternative is to throw litigants
22  out of court on what may be deemed a curable technicality without
23  a meaningful opportunity to respond--an approach that the court
24  highly doubts the Ninth Circuit would condone.  Again, this
25  practice runs counter to summary judgment's assumed time-saving
26  properties.

27      Under such circumstances it is tempting to throw up
28  one's hands and simply say, as one court already has, that

1
2
3
4
5

> The device of summary judgment was conceived as a
> method of saving the time of the Court and litigants
> where the case is demonstrably spurious. Where, as
> here, the time and effort required for a satisfactory
> definitive resolution of the issues on the basis of the
> paper record presented on this motion might well exceed
> that required at a full-dress trial, the Court will not
> utilize the summary judgment procedure.

6 Koleinimport 'Rotterdam' N.V. v. Foreston Coal Export Corp., 283

7 F. Supp. 184, 188 (S.D.N.Y. 1968).  Surely, if the moving party

8 has to resort to 250 evidentiary objections to succeed on its

9 motion, there must be a question of fact lurking in the 127

10 exhibits filed by defendants and 176 exhibits filed by plaintiff

11 that defendants are attempting to hide from the court.

12 Unfortunately, the court cannot "grant or withhold summary

13 judgment merely because it would save time or expense."  Am.

14 Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc., 388

15 F.2d 272, 285 (2d Cir. 1967).  Consequently, the court will

16 proceed with any necessary rulings on defendants' evidentiary

17 objections and then address the merits of the motions for summary

18 judgment.

19         1.   Objections to Plaintiff's Affidavits

20       As previously noted, defendants filed a 41 page brief

21 attacking six declarations submitted by plaintiff in opposition

22 to defendants' motions for summary judgment.  Significantly,

23 however, plaintiff failed to cite to any of these affidavits with

24 the required specificity in his opposition brief.  On three

25 occasions, plaintiff provided incomplete citations to the Burch

26 declarations that failed to specify which of the two declarations

27 plaintiff intended to refer to or which paragraph supported

28 counsel's argument.  Plaintiff's papers also cited the Seyman and

Amato declarations once, again failing to specify which
paragraphs supported his argument.  Consequently, until
defendants raised their objections, the court had not even read,
and thus did not intend to rely on, any of the objectionable
affidavits.  See Carmen, 237 F.3d at 1031 (holding that whether
or not evidence is attached to a brief in opposition to a motion
for summary judgment, "Rule 56(e) requires that the adverse
party's 'response,' not just the adverse party's various other
papers, 'set forth specific facts' establishing a genuine
issue").

        Because defendants have thrown these affidavits into
the spotlight however, the court doubts that it can rely on
Carmen for the proposition that it need not consider their
contents.  The outcome in that case was driven by the fact that
it would be "absurdly difficult for a judge to perform a search,
unassisted by counsel, through the entire record, to look for"
any and all "evidence that the lawyer wants the judge to read."
Id. at 1030.  Thanks to defendants, however, plaintiffs
affidavits are no longer buried among the thousands of pages of
evidence submitted in support of and opposition to the instant
motions.

        Nevertheless, defendants will ultimately prevail
because plaintiff failed to take advantage of the court's
allowance for briefing on the evidentiary objections.  In
response to the court's instruction that plaintiff "file a
response to defendants' objections and/or amended declarations
that cure the objections", plaintiff simply re-filed nearly
identical affidavits and a very general brief in which he

contended that defendants' hearsay objections should be overruled
because plaintiff's statements describe his "protected activity"
and the discriminatory statements of others, which constitute an
exception to hearsay.  While this may be true, this broad
argument does not help the court resolve defendants' 120 specific
objections, which was the purpose of providing plaintiff with a
chance to respond.  Moreover, the court is unmoved by plaintiff's
claims that he did not have enough time to prepare a more
detailed response, given that plaintiff somehow managed to
prepare, in addition to his "response" to defendants' objections,
another 18 page brief on the merits of the summary judgment
motions.  (See Pl.'s Gen. Resp. to Def.'s Objs.)  The court
cannot be held responsible for plaintiff's lack of focus nor can
it be expected to serve as plaintiff's lawyer and draft a legally
supported rebuttal to defendants' objections.  Consequently,
because plaintiff has largely failed to respond to defendants'
evidentiary objections to the Burch, Seyman, Maben, Hong, Amato,
and Walker, Jr. declarations, these objections are sustained.

2.   Objections to Plaintiff's Exhibits

In another 26 page brief, defendants separately raise
an equal, if not greater, number of objections to plaintiff's
exhibits.  According to defendants, plaintiff only attempted to
authenticate 20 of his 176 exhibits and based on this oversight,
defendants generally move "to strike all of Plaintiffs' Exhibits
that are not self authenticating."  (Defs.' Evid. Objs. to Pl.'s
Evid. 2.)  Because defendants only generally raise this objection
without specifying which of the numerous exhibits (some of which
consist of several separate documents that might individually be

27

1  self authenticating) are actually not self authenticating, the

2  court overrules this objection.  The burden is on defendants to

3  state their objections with specificity.  Cf. Wright et al., 10B

4  Federal Practice and Procedure § 2738 ("It follows that a motion

5  to strike should specify the objectionable portions of the

6  affidavit and the grounds for each objection.  A motion asserting

7  only a general challenge to an affidavit will be ineffective.").

8  Moreover, because defendants do not actually dispute the

9  authenticity of these documents, the court is confident plaintiff

10  would be able to authenticate them at trial, which is all that

11  Rule 56(e) demands.

12      Regarding defendants' specific objections to particular

13  exhibits, the court largely declines to rule on admissibility

14  because, in a serendipitous turn of events, it found it

15  unnecessary to rely on most of the objectionable exhibits, with a

16  few exceptions.  First, the court overrules defendants'

17  objections to exhibits 3-8 (plaintiff's responses to the

18  interrogatories of various named defendants) because again,

19  defendants have only very generally objected to these documents

20  in their entirety based on the argument that they "contain"

21  hearsay.  The court is not inclined to comb through these

22  documents, identify potential hearsay, and determine if an

23  exception applies--all without guidance from the parties.  Cf.

24  Wright et al., 10B Federal Practice and Procedure § 2738 ("[A]

25  motion to strike should specify the objectionable portions of the

26  affidavit and the grounds for each objection." (emphasis added)).

27      Second, the court overrules defendants' objections to

28  pages 714:11-715:14 of the Burch Deposition in exhibit 13.

Therein, plaintiff testified that defendants refused to disclose the reasons for his termination at the May 29, 2001 meeting.  The statements and communicative acts attributed to defendants are not offered for their truth (in other words to show that defendants had no reason for firing plaintiff).  Instead, they are offered to prove conduct from which the court can infer a discriminatory intent.  Such statements are not hearsay.  <u>See Calmat Co. v. U.S. Dep't of Labor</u>, 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay.").[12]

Having addressed defendants' evidentiary objections,[13] the court is finally ready to proceed with the merits of these motions for summary judgment--nearly ten months after they were first filed.

B.   <u>Summary Judgment</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that could affect the outcome of

---

[12]   Additionally, the portions of plaintiff's deposition that defendants raise these hearsay objections to were solicited by <u>defendants</u>' attorney.  It seems absurd to permit counsel the opportunity to object to her own line of questioning.

[13]   The court also relies on the UCD Wrestling Media Guides, (Pl.'s SUF Exs. 20-24), simply to describe the team and the wrestling program.  Nothing in these guides actually impacts the court's analysis here.

the suit, and a genuine issue is one that could permit a
reasonable jury to enter a verdict in the non-moving party's
favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).  The party moving for summary judgment bears the initial
burden of establishing the absence of a genuine issue of material
fact and can satisfy this burden by presenting evidence that
negates an essential element of the non-moving party's case.
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).
Alternatively, the movant can demonstrate that the non-moving
party cannot provide evidence to support an essential element
upon which it will bear the burden of proof at trial.  <u>Id.</u>

Once the moving party meets its initial burden, the
non-moving party must "go beyond the pleadings and by her own
affidavits, or by 'the depositions, answers to interrogatories,
and admissions on file,' designate 'specific facts showing that
there is a genuine issue for trial.'"  <u>Id.</u> at 324 (quoting Fed.
R. Civ. P. 56(e)).  The non-movant "may not rest upon . . . mere
allegations or denials of the adverse party's pleading . . . ."
Fed. R. Civ. P. 56(e); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135,
1137 (9th Cir. 1989).  However, any inferences drawn from the
underlying facts must be viewed in a light most favorable to the
party opposing the motion.  <u>Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Additionally, the
court must not engage in credibility determinations or weigh the
evidence, for these are jury functions.  <u>Anderson</u>, 477 U.S. at
255.

      1.   <u>Claim One: Retaliatory Discharge in Violation of
Title IX</u>

30

1    Although not explicitly provided for in the text of

2    statute,[14] the Supreme Court has held that an implied cause of

3    action exists under Title IX for retaliation based on an

4    individual's complaints of sex discrimination.  Jackson v.

5    Birmingham Bd. of Educ., 125 S. Ct. 1497, 1504 (2005); see also

6    id. at 1506 (reasoning that retaliation for advocacy of the

7    rights of female athletes is "'discrimination' 'on the basis of

8    sex.'").  In establishing this right, the Court observed that

9    while Title VII, 42 U.S.C. §§ 2000e to 2000e-17, another

10   discrimination law, explicitly provides for a detailed

11   retaliation cause of action, Title IX very generally prohibits

12   discrimination--so much so that its broad language encompasses an

13   implicit claim for retaliation.  Id. at 1501; see also 42 U.S.C.

14   § 2000e-3(a) (Title VII retaliation provisions).  The Court did

15   not, however, provide guidance on how to evaluate a Title IX

16   retaliation claim.  In the absence of such guidance, the court

17   will assess plaintiff's claim according to Title VII's well

18   developed standards.  Ray v. Henderson, 217 F.3d 1234, 1240 (9th

19   Cir. 2000) (applying the burden-shifting proof scheme from

20   McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), in

21   a Title VII retaliation case); see also Johnson v. Baptist Med.

22   Ctr., 97 F.3d 1070, 1072 (8th Cir. 1996) ("[T]he method of

23   evaluating Title IX gender discrimination claims is the same as

24   those in a Title VII case."); Preston v. Virginia ex rel New

25

26        [14]   Title IX states only that "[n]o person in the United
     States shall, on the basis of sex, be excluded from participation
27   in, be denied the benefits of, or be subjected to discrimination
     under any education program or activity receiving Federal
28   financial assistance."  20 U.S.C. § 1681.

31

River Comm. College, 31 F.3d 203, 207, 208 (4th Cir. 1994)
(holding that a Title IX discrimination claim can be evaluated in
accordance with principles governing Title VII claims); Weaver,
71 F. Supp. 2d at 793.

Accordingly, to survive this motion for summary
judgment on his Title IX claim, plaintiff must first "prov[e][15] a
prima facie case of discrimination based on opposition to [a
discriminatory] practice." EEOC v. Crown Zellerbach Corp., 720
F.2d 1008, 1012 (9th Cir. 1983); see also McDonnell Douglas, 411
U.S. at 802.  If he survives this hurdle, the burden of
production shifts to the defendants "'to articulate some
legitimate, nondiscriminatory reason' for the adverse employment
action."  Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine,
450 U.S. 248, 253 (1981)).  Finally, if the defendants meet their
burden, the plaintiff has an opportunity to demonstrate that "the
stated reason was not the defendant's true reason for acting, but
a pretext for discrimination."  Id.

A plaintiff establishes a prima facie case of
retaliation by showing "that: 1) he engaged in a protected
activity; 2) he [subsequently] suffered an adverse employment
decision; and 3) there was a causal link between the protected
activity and the adverse employment decision."  Villiarimo v.
Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).
Significantly, complaining informally to a supervisor is a
protected activity, as is complaining about the discriminatory

_____

[15]     Although the framework addresses burdens of "proof",
the Ninth Circuit has made clear that "[a]t the summary judgment
stage, the prima facie case need not be proved by a preponderance
of the evidence."  Yartzoff, 809 F.2d at 1375.

treatment of others.  Ray, 217 F.3d at 1240 n.3.  Additionally,

"[c]ausation sufficient to establish the third element of the

prima facie case may be inferred from . . . the proximity in

time between the protected action and the allegedly retaliatory

employment decision."  Yartzoff v. Thomas, 809 F.2d 1371, 1376

(9th Cir. 1987).  However, if a plaintiff's causation arguments

rest on the relative timing of his protected activity and his

dismissal, the plaintiff must also clearly show that the

defendant was aware of the protected activity when the adverse

employment decision was made.  Id. at 1375 (citing Miller v.

Fairchild Indus., Inc., 797 F.2d 727, 731 n.1 (9th Cir. 1986),

for the proposition that "an employer's decision on a course of

action made prior to learning of the employee's protected

activity does not give rise to an inference of causation").

        The parties do not appear to dispute that shortly after

April 24, 2001, when the women wrestlers filed their

discrimination complaint, defendants were aware of plaintiff's

belief that sex discrimination in violation of Title IX had

transpired.  Plaintiff undeniably influenced the athletes'

decision to file a complaint and he visibly supported their

cause.  Starting in May, and perhaps in late April, plaintiff

actively "complain[ed] about the discriminatory treatment of

others," which is a protected activity.  Ray, 217 F.3d at 1240

n.3.

        Whether plaintiff was engaged in protected activity

prior to April 24, 2001 is not as clear.  Although informal

complaints to a supervisor are protected, see id., plaintiff's

limited citations to interrogatories and deposition testimony in

33

support of his motion do not establish that plaintiff complained
of <u>discrimination</u> against the female wrestlers prior to May,
2001.  Instead, plaintiff's evidence appears to show only that he
appealed to his supervisors to recognize a women's varsity
wrestling team.[16]

        This advocacy is not equivalent to a complaint of
discrimination.  <u>Cf.</u> <u>Jurado v. Eleven-Fifty Corp.</u>, 813 F.2d 1406
(9th Cir. 1987) (holding that plaintiff failed to establish that
he engaged in protected activity when he complained about the

---

        [16]  Plaintiff <u>contends</u> in his opposition brief that in
March, 2001, he sought to "use the clout of his success [during
the 2000-01 season] to push harder for the reinstatement of the
women wrestlers." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. 26-
27.)  The brief states, without citing any depositions, answers
to interrogatories, or affidavits, that at this time, plaintiff
"asked Defendants Warzecka and Swanson to reinstate the women and
reiterated his belief that Defendants had discriminated against
them." (<u>Id.</u> at 27.)  In general, the entire section of
plaintiff's brief describing his "Extensive Protected Activity"
is almost completely devoid of supporting citations that might
direct the court to evidence that plaintiff accused his
supervisors of discrimination, as opposed to merely pressuring
them for a women's wrestling team, prior to May, 2001. (<u>Id.</u> at
19-33.)  Perhaps recognizing this hole in his presentation,
plaintiff relies on comments made to his co-workers that <u>could</u>
have been heard by "anyone walking by" his office to support his
allegations that his supervisors <u>knew</u> that he believed the women
wrestlers were the victims of sex discrimination. (<u>Id.</u> at 37.)
Plaintiff cannot successfully oppose defendants' motion for
summary judgment with mere suspicions and undocumented arguments.
<u>See</u> <u>S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde &
Co.</u>, Inc., 690 F.2d 1235, 1238 (9th Cir. 1982) (holding that "a
party cannot manufacture a genuine issue of material fact merely
by making assertions in its legal memoranda").  He must instead
identify portions of the <u>record</u> that call into question the
material facts of this case.  In the absence of evidentiary
support, the court is not obligated to "search the entire record
to establish that it is bereft of a genuine issue of material
fact." <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1480 (6th
Cir. 1989); <u>see also</u> <u>Newman v. Checkrite Cal., Inc.</u>, 912 F. Supp.
1354, 1377 n.34 (E.D. Cal. 1995) ("On summary judgment, where our
Local Rule 260 requires the parties to cite to evidentiary
record, it is not the court's job to go sifting through
depositions looking for evidence.").

impact that an English-only rule would have on his reputation as a radio personality and only alleged that this same conduct was discriminatory after he was fired).  Moreover, because establishing a women's wrestling team, as opposed to more varsity opportunities for women in general, was not required to comply with Title IX, the court cannot say that defendants should have interpreted plaintiff's inexact complaints as complaints of discrimination.  Cf. Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995) ("A general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination.").  (See also Pl.'s SUF No. 39 (recognizing that "Title IX compares actual participation opportunities for males and females, not the number of sports")).  Plaintiff may not be required to use "magic words" to engage in protected activity, but he did have an obligation to "at least say something to indicate [that gender was] an issue."[17]  Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1008 (7th Cir. 2000); Mayfield v. Sara Lee Corp., No. C 04-1588, 2005 WL 88965, at *8 (N.D. Cal. Jan. 13, 2005) (recognizing plaintiff's duty to "alert[] his employer to his belief that discrimination, not merely unfair . . . treatment, had occurred").  Significantly, plaintiff has failed to point the

---

[17]    The Ninth Circuit has noted, in a discussion of retaliation for protected speech, that "an employee need not expressly accuse her supervisor or employer of illegal activity. Rather, [he] may convey an implicit message of disapproval of the illegality of the activity through her conduct by refusing to facilitate or participate in it."  Thomas v. City of Beaverton, 379 F.3d 802, 809 (9th Cir. 2004).  Under this theory, plaintiff could assert that he refused to apply the roster caps to women as a means of protesting their discriminatory treatment.  However, the court again notes that plaintiff has failed to identify portions of the record that would support such an inference.

1  court to any declarations or testimony where he described under

2  oath how he objected to <u>gender discrimination</u> prior to May, 2001.

3  Meanwhile, Warzecka has declared that prior to May, 2001, he did

4  not construe any of plaintiff's opinions on the plight of the

5  female wrestlers as allegations of gender discrimination.

6  (Defs.' SUF Ex. A (Warzecka Decl. ¶ 16).)

7       Consequently, the court will only consider plaintiff's

8  actions after April 24, 2001 as evidence that he engaged in

9  protected activity.  Based solely on these undertakings, however,

10  plaintiff can still establish his prima facie case, given that

11  they occurred throughout the month of May, defendants were aware

12  of them, and plaintiff was notified that his contract would not

13  be renewed on May 29, 2001, shortly after these events.  <u>See</u>

14  <u>Miller</u>, 797 F.2d at 731 (holding that proximity of known

15  protected activity and an adverse employment action can establish

16  causation and, relatedly, plaintiff's prima facie case).

17       Plaintiff's evidentiary proof is thus sufficient to

18  shift the burden to defendants and require them to provide a

19  legitimate explanation for the decision not to renew plaintiff's

20  contract.  Accordingly, in their defense, defendants offer two

21  explanations: (1) the decision was made on April 24, 2001, before

22  they were informed of plaintiff's protected activities, and (2)

23  the decision was made based on plaintiff's conflicts with other

24  staff members, his disregard for Department rules, his

25  unreasonable demands for more money, his repeated budget

26  deficits, and his failure to cooperate during an investigation

27  into possible NCAA violations.  (Defs.' SUF No. 132.)  Because

28  defendants need only rebut plaintiff's prima facie showing, these

36

1    simple arguments, supported by deposition testimony and other

2    documentation, are sufficient to shift the burden of proof back

3    to plaintiff.  Lynn v. Regents of Univ. of Cal., 656 F.2d 1337,

4    1344 n.7 (9th Cir. 1981).

5            To create a genuine issue of material fact sufficient

6    to defeat summary judgment, plaintiff must now show "that the

7    employer's articulated reasons are a mere pretext for what, in

8    fact, is a discriminatory purpose." Ferguson v. Wal-Mart Stores,

9    Inc., 114 F. Supp. 2d 1057, 1063 (E.D. Wash. 2000).  In response

10   to this obligation, plaintiff identifies several inconsistences

11   in defendants' presentation that cast doubt on the reliability of

12   their proffered reasons.  Regarding the timing of the decision

13   not to renew plaintiff's contract, plaintiff points out that

14   there are discrepancies in Warzecka, Gill-Fisher, and Swanson's

15   testimony regarding who attended the April 24, 2001 meeting where

16   the decision to terminate his employment was allegedly made.

17   There are also disputes over the input that each attendee

18   provided.  For example, Warzecka testified that Bullis

19   contributed heavily, at the meeting, to the decision and further

20   opined that "[Swanson] had less input than [Bullis] and [Gill-

21   Fisher] and myself[] [beacuse] he . . . supervised [plaintiff]

22   the least amount of time and had the least amount of interraction

23   with [him] . . . ." (See Pl.'s SUF Ex. 16 (Warzecka Dep. 636:11-

24   642:9).)  In contrast, Swanson testified that Bullis was not

25   present at the meeting, that Bullis was out of town that day, and

26   that, based on his extensive relationship with plaintiff

27   throughout his employment, he (Swanson) provided a long list of

28   reasons not to renew plaintiff's contract.  (Id. Ex. 18 (Swanson

                                   37

1  Dep. 11:16-12:21, 83:13-15, 111:10-12).)

2          Additionally, plaintiff notes that defendants continued
3  to actively negotiate his contract for the 2001-02 season,
4  despite allegedly having already decided not to renew plaintiff's
5  employment.  Defendants attempt to justify this conduct by
6  explaining that, pursuant to Department policy, the decision not
7  to renew a contract was not released until one month before the
8  existing contract was set to expire.  (Defs.' SUF No. 180.)
9  However, plaintiff identified other instances where contracts
10  were not renewed and the coaches were notified well in advance of
11  the expiration of their existing contracts.  (See Pl.'s SUF Ex.
12  16 (Warzecka Dep. 668:11-669:4).)  Furthermore, internal
13  communications show that defendants were discussing in detail
14  plaintiff's future employment and salary over a week after they
15  had allegedly decided to terminate him.  (Pl.'s SUF Ex. 101 (May
16  3, 2001 Email from Greg Warzecka to Dennis Shimek (specifying
17  possible 2001-02 salaries that "we [UCD Athletics] would
18  consider" for Mike Burch, depending on the results of an
19  impending performance evaluation)).)

20          Cumulatively, plaintiff argues that this evidence
21  supports his theory that the decision not to renew his contract
22  was not made on April 24, 2001.  Furthermore, based on
23  defendants' seemingly inconsistent testimony, a reasonable fact
24  finder could likewise conclude that the meeting did not take
25  place when defendants allege it did and that the decision was
26  actually made at some later date, when defendants were

27

28

38

undisputably aware of plaintiff's protected activity.[18]

Plaintiff has also unearthed evidence that some of the reasons given by Warzecka for his termination were pretext.  He identifies other coaches who ran over their budgets and defendants even admit that up to 30% of coaches run deficits "from as little as $100 to a maximum of approximately $5,000." (Defs.' SUF No. 172.)  He also presents testimony from the UCD Assistant Athletic Director for Compliance, which revealed that UCD conducts about ten investigations into potential NCAA rule violations each year and that during plaintiff's six year tenure, he was the focus of these investigations on only two or three occasions.  (Pl.'s SUF Ex. 126 (Cardone Dep. 124:18-125:9, 128:7-15).)  Additionally, plaintiff points out that Lennie Zalesky, plaintiff's replacement, testified that he has not been held to the same paperwork deadlines that plaintiff allegedly ignored. (Id. Ex. 133 (Zalesky Dep. 123:19-124:2, 126:11-13).)  Most suspicious, however, was defendants' apparent failure to articulate any of these reasons, despite plaintiff's request for some explanation, at the May 29, 2001 meeting where plaintiff learned of his dismissal.  (See Pl.'s SUF Ex. 13 (Burch Dep. 714:1-715:14 (testifying that defendants simply responded, "We don't have to tell you" and implied that plaintiff should "know

---

[18]     The court recognizes that the Supreme Court has observed that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).  However, even assuming that this Title VII doctrine applies in a Title IX analysis, the evidence presented here suggests that the decision not to renew plaintiff's contract may not have been "along lines previously contemplated."

1  by now . . . what the reasons are.")).)

2      Defendants contend that it was not one thing in
3  particular, but rather plaintiff's cumulative record of
4  infractions, that justified his dismissal.  Significantly,
5  plaintiff has not identified another similarly situated
6  individual who butted heads with his superiors on the same volume
7  of issues.  (Cf. Defs.' P. & A. in Supp. of Mot. for Summ. J. 70
8  ("[N]o other coaches have presented as many problems as Plaintiff
9  did.").)  However, a "plaintiff may show pretext either (1) by
10 showing that unlawful discrimination more likely motivated the
11 employer, or (2) by showing that the employer's proffered
12 explanation is unworthy of credence because it is inconsistent or
13 otherwise not believable."  Dominguez-Curry v. Nev. Transp.
14 Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005) (emphasis added).  The
15 repeated instances where plaintiff has identified weaknesses and
16 contradictions in defendants' proffered reasons satisfy the
17 "unworthy of credence" prong of the pretext analysis and cast
18 sufficient doubt on defendants' explanation to permit a
19 reasonable factfinder to infer that defendants did not act for
20 the asserted reasons.  See Fuentes v. Perskie, 32 F.3d 759, 764
21 n.7 (3d Cir. 1994) ("If the defendant proffers a bagful of
22 legitimate reasons, and the plaintiff manages to cast substantial
23 doubt on a fair number of them, the plaintiff may not need to
24 discredit the remainder."); Combs v. Plantation Patterns, 106
25 F.3d 1519, 1538 (11th Cir. 1997).  Consequently, genuine issues
26 of material fact preclude summary judgment on plaintiff's
27 retaliation claim against UCD.

28      2.   Claim Two: § 1983 Liability for Infringing on

1                    Plaintiff's First Amendment Rights

2              In addition to his Title IX claim against UCD,

3    plaintiff is also suing his supervisors under § 1983 for

4    retaliating against him for exercising his constitutionally

5    protected right of free speech.  "[T]o establish a prima facie

6    case of retaliation under the First Amendment, [plaintiff] must

7    show that (1) [he] engaged in protected speech on a matter of

8    public concern; (2) . . . defendants took an 'adverse employment

9    action' against [him]; and (3) [his] speech was a 'substantial or

10   motivating' factor for the adverse employment action."  Thomas,

11   379 F.3d at 808; see also Connick v. Myers, 461 U.S. 138, 147

12   (1983).  If plaintiff makes a prima facie showing, the burden

13   shifts to defendants to demonstrate either that (1) their

14   "legitimate administrative interests outweigh the [plaintiff's]

15   First Amendment rights" or (2) that they "'would have reached the

16   same decision even in the absence of [plaintiff's] protected

17   conduct.'"  Thomas, 379 F.3d at 808 (quoting Ulrich v. City &

18   County of San Francisco, 308 F.3d 968, 976-77 (9th Cir. 2002)).

19                 a.   Summary Judgment for All Defendants

20             In the analysis in Part II.B.1, the court concluded

21   that plaintiff has sufficiently demonstrated for purposes of

22   summary judgment that he engaged in protected activity and that

23   he suffered an adverse employment action shortly thereafter.

24   Similarly, plaintiff has already satisfied the "substantial or

25   motivating factor" prong of the prima facie analysis by

26   identifying a question of fact as to whether at least some of

27   defendants' "explanations for the adverse employment action were

28   false and pre-textual."  Coszalter v. City of Salem, 320 F.3d

                                41

968, 977 (9th Cir. 2003) (identifying "three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions").

The remaining questions are therefore (1) whether plaintiff spoke on a matter of public concern; (2) whether defendants' legitimate administrative interests outweigh the plaintiff's First Amendment rights; and (3) whether defendants would, in the absence of plaintiff's protected conduct, still have elected not to renew his contract.  The first question can be quickly disposed of, as the Supreme Court has recognized that speech protesting discrimination involves "a matter inherently of public concern."  Connick v. Myers, 461 U.S. 138, 148 n.8 (1983); Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 412-13, 417 (1979) (implicitly holding that complaints of discrimination are matters of public concern).  The second question, regarding defendants' legitimate administrative interests, is also easily dispatched because defendants bear the burden of establishing such an interest and they failed to explicitly make this argument in their moving papers.[19]

---

[19]   Defendants perhaps implicitly make this argument in their discussion of Lewis v. Smith, 255 F. Supp. 2d 1054 (D. Ariz. 2003), however, that case is factually distinguishable.  To shore up its primary holding that plaintiff had not spoken on a matter of public concern, the court in Lewis held that the defendants "had a legitimate interest in maintaining the effective functioning of [a] small coaching staff" and this interest outweighed the plaintiff's "limited First Amendment interest."  255 F. Supp. 2d at 1071.  In contrast, Burch's First Amendment interest in publicly supporting the women wrestlers' discrimination complaint is not a "limited" one.  Moreover, he did speak on a matter of public concern.  See also Bernasconi v. Tempe Elementary Sch. Dist. No. 3, 548 F.2d 857, 862 (9th Cir.

The third and final question is decidedly more
difficult.  Defendants can still prevail on their motion for
summary judgment if they can "demonstrat[e] that [they] would
have made the same decision absent the forbidden consideration."
Texas v. Lesage, 528 U.S. 18, 20-21 (1999) (citing Mt. Healthy
City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).
To demonstrate this, defendants discuss at length the
deteriorating relationship between plaintiff and his supervisors.
In particular, defendants cite to their depositions, where they
testified that as early as February, 2001, they started having
discussions about not renewing plaintiff's contract because he
was "always confrontational", failed to follow policies and
procedures, and had philosophical differences with administrators
over how to achieve Title IX compliance.[20]  (Pl.'s SUF Ex. 16

---

1977) ("[Where] public statements made by the plaintiff were
directed primarily at a general practice rather than at named
individuals, the court finds the balance to tip in favor of the
[plaintiff's] right to speak." (quoting the underlying District
Court order)).

[20]   The "philosophical differences" refer, in part, to
plaintiff's arguably unique perspective on Title IX.  (Defs.' SUF
Ex. A (Warzecka Decl. ¶ 29).)  As previously explained,
defendants implemented a roster management plan for the purposes
of reducing costs and achieving greater proportionality between
the number of male and female varsity athletes.  (Id. (Warzecka
Decl. ¶ 7).)  Pursuant to the plan, the number of spots for males
on the varsity team rosters at UCD were capped.  In response to
this change, plaintiff sent a memorandum to Vice Chancellor of
Student Affairs Carol Wall and defendants Warzecka, Franks, and
Gill-Fisher in which he thoughtfully analyzed the issue.  (See
id. Ex. FF (June 22, 1999 Burch Mem.).)  Plaintiff started his
memo by stating that "I am in the minority among my wrestling
coach colleagues in believing that Title IX is a fair piece of
legislation" and "[i]n fact I believe that Title IX doesn't go
far enough toward equity for women in sport."  (Id.)  However,
the purpose of plaintiff's memo was not to extol the virtues of
Title IX but to lobby against the roster caps and for the male
recruits of marginal potential who consequently would not have an

1  (Warzecka Dep. 574:14-25, 576:1-12, 578:14-19, 567:24-568:24,

2  572:25-574:11).)   Plaintiff does not dispute that the decision

3  not to renew his contract "had been contemplated since early

4  2001." (Id. No. 130.)

5         Nevertheless, the fact that defendants were

6  contemplating a decision not to renew plaintiff's contract does

7  not show that they would have taken the same action in the

8  absence of any protected activity.  See Allen v. Scribner, 812

9  F.2d 426, 435 (9th Cir. 1987) (noting that even though

10 "insubordinate conduct might have justified an adverse employment

11 decision, [this] does not suffice" to show that the plaintiff

12 would have received the same treatment (emphasis added)).

13 Particularly troubling is plaintiff's evidence which suggests

14 that his participation in public protests accusing UCD of Title

15 IX discrimination might have been the event that actually secured

16 his termination.  (Pl.'s SUF Ex. 5 (Pl.'s Resps. to Interrogs. of

17 Robert Franks, No. 6 (answering that on May 25, 2001, when

18 plaintiff asked why his contract had been delayed, "Mr. Franks

19 told [plaintiff] that his public support for the women wrestlers

20 'was making it very difficult for us to love you.'")).)   In light

21 of this evidence, and without making credibility judgments, it is

22 difficult for the court to say defendants would have terminated

23 plaintiff regardless of his speech activities.

24         Moreover, the court notes that this portion of the

25 analysis of a free speech/retaliation claim generally presents a

26 question of fact for the jury.  Soranno's Gasco, Inc. v. Morgan,

27 ─────────────────

28 opportunity to wrestle at UCD.  (Id.)

874 F.2d 1310, 1315 (9th Cir. 1989).  Summary judgment might be warranted in cases where the plaintiff has conceded that he would have been terminated regardless, where the defendants can point to similarly situated individuals who were fired for comparable reasons, or where a more qualified applicant was hired in lieu of the plaintiff.  <u>See, e.g.</u>, <u>Harris v. Shelby County Bd. of Educ.</u>, 99 F.3d 1078, 1085 (11th Cir. 1996) (more qualified applicant). Presented with such facts, courts can say with confidence that defendants <u>would</u> have made the same decision.  However, these circumstances are not present in this case and consequently, plaintiff's § 1983 claim must be heard by a jury.[21]

b.  <u>Summary Judgment for Defendant Vanderhoef</u>

As noted above, defendant Vanderhoef's individual motion for summary judgment is also before the court.  Plaintiff has sued Vanderhoef based on allegations that Vanderhoef "has overall authority and control over the day-to-day operations of UC-Davis, including the athletic department, the wrestling program, and its coaches" and thus is responsible in part for failing to prevent plaintiff's alleged retaliatory discharge at the direction of Warzecka.  (Compl. ¶ 12.)

However, a supervisor cannot be held liable under § 1983 on a respondeat superior basis, absent a statute stating otherwise.  <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446

---

[21]  <u>Williams v. Day</u>, 553 F.2d 1160 (8th Cir. 1977), highlighted by defendants at oral argument, is not to the contrary.  In that case, the Eighth Circuit affirmed the District Court's finding, <u>after a trial</u>, that "[t]he decision was not in any way based upon the plaintiff's exercise of his First Amendment rights."  <u>Id.</u> at 1163; <u>Williams v. Day</u>, 412 F. Supp. 336, 339-40 (E.D. Ark. 1976).

1  (9th Cir. 1991); <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir.

2  1989).  "A supervisor may be liable under § 1983 only if there

3  exists either '(1) his or her personal involvement in the

4  constitutional deprivation, <u>or</u> (2) a sufficient causal connection

5  between the supervisor's wrongful conduct and the constitutional

6  violation.'"  <u>Jeffers v. Gomez</u>, 267 F.3d 895, 915 (9th Cir. 2001)

7  (quoting <u>Redman</u>, 942 F.2d at 1446 (emphasis added)).  Under the

8  second pathway to liability, a sufficient causal connection

9  exists when the supervisor was the "moving force" behind the

10 alleged violation, as evidenced by the fact that (1) his "own

11 culpable action or inaction in the training, supervision, or

12 control of his subordinates" resulted in injury, (2) he

13 acquiesced in the constitutional injuries complained of, or (3)

14 his conduct shows "a reckless or callous indifference to the

15 rights of others."  <u>Larez v. City of Los Angeles</u>, 946 F.2d 630,

16 646 (9th Cir. 1991) (citations omitted).

17       Vanderheof denies any involvement in the decision not

18 to renew plaintiff's contract and testified that he never

19 discussed plaintiff's employment with Warzecka, Gill-Fisher,

20 Swanson, or Franks.  (Vanderhoef's SUF Ex. Y (Vanderhoef Decl. ¶

21 3), Ex. BB (Warzecka Decl. ¶ 4).)  Significantly, Warzecka (who

22 was several levels removed from Vanderheof in the UCD

23 organization charts) and Eleanor Sandoval (Human Resources), not

24 Vanderhoef, were the signatories to plaintiff's most recent

25 employment contracts on behalf of UCD.  (Defs.' SUF Exs. L-M

26 (contracts).)  Additionally, the person with admitted authority

27 to overrule plaintiff's termination, Associate Vice Chancellor

28

46

1  Franks, was a subordinate of Vanderhoef's subordinate.[22]  (Pl.'s

2  SUF Ex. 15 (Franks Dep. 118:18-120:23).)

3      To challenge Vanderhoef's claimed lack of involvement,

4  plaintiff contends that because Vanderhoef and Warzecka were

5  friends and saw each other socially in work-related settings,

6  Vanderhoef must have discussed the matter of plaintiff's

7  employment with Warzecka.  (Id. Ex. 14 (Vanderhoef Dep. 59:19-

8  60:12, 64:18-19).)  However, plaintiff's mere suspicions cannot

9  refute Vanderhoef's evidence that he was not involved in the

10 alleged deprivation of plaintiff's constitutional rights and that

11 Vanderhoef and Warzecka did not discuss the matter.  See Karam v.

12 City of Burbank, 352 F.3d 1188, 1194 (9th Cir. 2003) (noting that

13 "speculation . . . does not rise to the level of evidence

14 sufficient to survive summary judgment").

15     Based on the actual evidence before the court, a

16 factfinder could not reasonably infer that Vanderhoef was

17 directly involved in the decision not to renew plaintiff's

18 contract or that he was the moving force behind the decision.  It

19 is simply unreasonable to expect that a person who oversees an

20 organization that employs over 27,000 people would have any

21 involvement in employment decisions for positions that are

22

23     [22]  As an aside, it is not clear that authority to overrule
   Warzecka's decision will open the door to § 1983 liability
24 because "mere refusal [or failure] to overrule a subordinate's
   completed act does not constitute approval."  Christie v. Iopa,
25 176 F.3d 1231, 1239 (9th Cir. 1999); cf. Ortez v. Wash. County,
   Or., 88 F.3d 804, 809 (9th Cir. 1996) (observing that
26 "supervisors are liable for the constitutional violations of
   their subordinates 'if the supervisor participated in or directed
27 the violations, or knew of the violations and failed to act to
   prevent them'" (quoting Taylor, 880 F.2d at 1045) (emphasis
28 added)).

several levels below him, especially when he had no reason, based

on past behavior, to suspect that the involved subordinates were

prone to abusing their power to effectuate constitutional

violations. (Vanderhoef's SUF Ex. Z (Shimek Decl. ¶ 2), Ex. Y

(Vanderhoef Decl. ¶ 6).)  Moreover, as the Ninth Circuit has

noted, to hold managers liable for "fail[ure] to overrule the

unconstitutional discretionary acts of subordinates would simply

smuggle respondeat superior liability into section 1983 law."

Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir. 1992)

(addressing municipal liability).  Summary judgment as to

Vanderhoef is therefore warranted, as he cannot be held

vicariously liable for Warzecka's and others' decision to

terminate plaintiff.[23]

        IT IS THEREFORE ORDERED that

        (1) defendants' motion for summary judgment as to UCD

be, and the same hereby is, DENIED.

        (2) defendants' motion for summary judgment as to

defendants Warzecka, Gill-Fisher, Franks, and Swanson be, and the

---

[23]     In passing, defendants note that "[s]ince § 1983 does
not provide for vicarious liability, . . . FRANKS . . . can [not]
be liable for the contract decision absent evidence that [he]
somehow caused the alleged constitutional violation." (Defs.'
Mem. of P. & A. in Supp. of Mot. for Summ. J. 83.)  Defendants
attempt to further develop this argument in their reply, but
these newly emphasized contentions are untimely.  Moreover,
because Vanderhoef's role in this case is sufficiently
distinguishable from Franks' role, given that Franks was involved
almost immediately after the women filed their OCR complaint and
admittedly had discussions with Warzecka about the propriety of
plaintiff's dismissal in light of that event, (Pl.'s Ex. 15
(Franks Dep. 87:20-90:21)), the court cannot say that the
analysis applicable to Vanderhoef would automatically extend to
Franks.  Consequently, because defendants have not fully
developed a supervisory liability argument with respect to
Franks, the court declines to consider it.

1    same hereby is, DENIED.

2              (3) defendants' motion for summary judgment as to

3    defendant Vanderhoef be, and the same hereby is, GRANTED.

4    DATED:   June 2, 2006

5

6    _____
     WILLIAM B. SHUBB

7    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28